OPINION
{¶ 1} Plaintiff-appellant Shawn Bonner appeals from the December 30, 2005 and March 14, 2006, Judgment Entries of the Guernsey County Court of Common Pleas, Domestic Relations Division.
 STATEMENT OF THE FACTS AND CASE {¶ 2} Appellant Shawn Bonner and appellee Courtney Deselm-Bonner were married in 1999 and are the parents of Tyler (DOB 4/21/98), Shane (DOB 11/29/99) and Jevon (DOB 11/14/01). Pursuant to a Decree of Divorce filed in November of 2002, the parties were granted a divorce. Appellee was designated as the residential parent and legal custodian of the parties' minor children while appellant was awarded parenting time. Both appellant and appellee are doctors.
 {¶ 3} Subsequently, on July 12, 2004, appellant filed a Motion to Modify Parental Rights and Responsibilities, alleging that there had been "a number of substantial changes in the circumstances of the Defendant [appellee] and the minor children . . ." Appellee, on September 10, 2004, also filed a Motion to Modify Parental Rights and Responsibilities alleging that there had been "a number of substantial changes in the circumstances of the Plaintiff [appellant] and the minor children . . ." Pursuant to an order filed on April 8, 2005, the trial court appointed a Guardian Ad Litem for the minor children.
 {¶ 4} A hearing on the pending motions commenced on June 13, 2005. Testimony was adduced at the hearing that appellee remarried in June of 2004 and that two stepchildren moved into appellee's house along with appellee's new husband, Jackson Flanigan. Denise Flynt, a licensed professional clinical counselor, testified that *Page 3 
she saw the Bonner children in a therapeutic relationship. Flynt testified that she previously was involved with the children during the parties' divorce and that more recently she had provided counseling for the two older children. The following testimony was adduced when Flynt was asked whether she saw a risk of harm to Tyler if something was not changed:
 {¶ 5} "A. I believe that in working with Tyler she's showed a great deal of anxiety and depression which are quite clearly mental health concerns surrounding the issues that she's disclosed to me in therapy associated with some visitation issues with her father. I do have mental health concerns regarding those. There are also some concerns about physical discipline but I'm not determining that to be abusive but rather a means of punishment used by the father that can possibly get out of control. It is against my recommendations to spank children but mentally I do have concerns that the child is very anxious and sad, shows sign of fearfulness also." Transcript at 215.[1] Flynt further testified that both Shane and Tyler did not want to miss school on Mondays due to Monday visits.
 {¶ 6} On cross-examination, Flynt was questioned about problems which the parties' children had with living in appellee's house. Flynt testified that she had concerns about life at appellee's house and answered in the affirmative when asked if the area of concern was relative to a step sibling. Flynt also testified that she suggested ways to alleviate those concerns and that "I just talked to the child last week about it and she told me things have improved significantly in that area of concern." Transcript at 226. *Page 4 
She further testified that she had voiced her concerns to appellee and that appellee took steps to address the same by scheduling family therapy involving the step family.
 {¶ 7} Vanessa Proudfoot, who worked for appellant as a nurse and administrative assistant from July of 2003 through April of 2004 and who had also worked for appellee, testified that Connie DeSelm, appellee's mother, had indicated to her that Jackson Flanigan, appellee's current husband, used inappropriate and foul language in front of his stepchildren. The following is an excerpt from Proudfoot's trial testimony:
 {¶ 8} "Q. Does, to the best of your knowledge, Jackson Flanigan have a son that resides with at least in part resides with Courtney Bonner?
 {¶ 9} "A. He has two of them.
 {¶ 10} "Q. And were there any comments made by Mrs. DeSelm about her concern for either or both of those children being in the presence of the minor Bonner children?
 {¶ 11} "A. Yes.
 {¶ 12} "Q. And specifically what and with respect to whom? To which Flanigan child?
 {¶ 13} "A. Jackson, little Jackson Jr., they call him Trevor.
 {¶ 14} "Q. What was the concern that was raised?
 {¶ 15} "A. That she said she was fearful for the children to be around him because of his behavior problems.
 {¶ 16} "Q. When you say she was fearful you mean that —
 {¶ 17} "A. Mrs. DeSelm, the grandmother. *Page 5 
 {¶ 18} "Q. The Bonner children's grandmother was concerned for the Bonner children's safety?
 {¶ 19} "A. Yes.
 {¶ 20} "Q. Because of Trevor Flanigan's past and/or present behavior?
 {¶ 21} "A. Yes.
 {¶ 22} "Q. Specifically did she state what she was concerned about or was it just a general fear?
 {¶ 23} "A. She did not give a pinpoint. She just said that she did not trust him around the children." Transcript at 162-163.
 {¶ 24} The following testimony was adduced when DeSelm was asked at the hearing whether she had ever told anyone that she feared for her grandchildren when they are in the presence of Trevor, appellee's stepson and the children's step-brother:
 {¶ 25} "A. I don't fear for them so I don't believe I would say I fear for them.
 {¶ 26} "Q. Have you ever expressed concern about the well being or welfare of your grandchildren in the presence of Trevor?
 {¶ 27} "A. I think they are exposed to seventh grade thinking.
 {¶ 28} "Q. Language you didn't like which —
 {¶ 29} "A. I never heard the use of bad language.
 {¶ 30} "Q. How about your son-in-law Jackson, have you ever been concerned about his foul language in the presence of the children?
 {¶ 31} "A. I'm trying to think. I've heard him swear but I don't not [sic] that I would be concerned about his —
 {¶ 32} "Q. Have you heard him swear in the presence of your grandchildren." *Page 6 
 {¶ 33} "A. I'm trying to think. I've not heard him use the Lord's name in vain or anything like that but I've heard him say damn it or something like that, yes.
 {¶ 34} "Q. I'm not trying to get too specific on swearing.
 {¶ 35} "A. I don't know exactly what you mean.
 {¶ 36} "Q. I suppose I mean anything that you would consider to be offensive language or you think the reasonably prudent person in this community would think to be offensive language or perhaps the Court's eyebrows might we [sic] raised if uttered here in open court.
 {¶ 37} "A. Unfortunately for me it might be offensive because I'm of the old school.
 {¶ 38} "Q. Have you ever indicated that you felt Trevor was a bad influence?
 {¶ 39} "A. I'm protective of the children so not a bad influence but an influence.
 {¶ 40} "Q. An influence that is not always positive? I don't want to split hairs with you.
 {¶ 41} "A. You know, he's more into the taking sides with one or the other and primarily he and Tyler would join forces with the boys being left out. That kind of thing.
 {¶ 42} "Q. And, what, pick on one of the boys?
 {¶ 43} "A. Give them a bad time like siblings do, I guess.
 {¶ 44} "Q. Is that different than picking on?
 {¶ 45} "A. I don't know." Transcript at 281-283.
 {¶ 46} Both appellant and appellee also testified at the hearing. Appellant testified that he was concerned about Jackson Flanigan and his role in the lives of appellant's children. Flanigan, according to appellant, called appellant a "pinhead" and a *Page 7 
"wife beater" in front of appellant's children. Transcript of June 13, 2005, afternoon hearing at 7. Appellant also testified that appellee refused to share information with him about the parties' children. Appellant testified that appellee did not seek his input on decisions affecting the health, education or welfare of the children and did not seek his advice or comments about healthcare providers for the children. He further testified that appellee rarely communicated with him when one of the children was sick and often delivered the children to him without informing him that they were sick or had been prescribed medication.
 {¶ 47} At the hearing, appellant also testified that, until Tyler told him, he was unaware that Tyler had been prescribed an inhaler. Appellant further testified that the children often came to visit with him without additional clothing or medication and that, when he mentioned such fact to appellee, he got no response. The following testimony was adduced when appellant was asked what kinds of things he would say to appellee about it:
 {¶ 48} "A. I asked for the bag and I asked her mom for the bag of clothes. This is probably one of the more frustrating things about our situation in that Javonne was still using formula and weaning the food or weaning formula and going to food and just can't get it out of them. Where are you with it, are you potty training, see out of — are you out of diapers, nothing. They don't want to have that conversation." Transcript at 69-70.
 {¶ 49} Appellant also testified that appellee never told him that Tyler missed a day of school to go to the dentist for an elective appointment. He further testified that the children often came to his house without homework. *Page 8 
 {¶ 50} On cross-examination, appellant testified that the children were delivered to him without the antibiotic that one or more of them was taking, although he was unable to recall what date this occurred. Appellant also testified that he did not call appellee or the pediatrician when he discovered that the medicine had not been sent. When asked, appellant testified that he had not spoken with the children's pediatrician about their health for at least one year prior to the hearing.
 {¶ 51} The Guardian Ad Litem, in a report filed on June 10, 2005, stated that she did not see any change in circumstance warranting a change of custody and that she did not believe that appellant's visitations with the children should be limited in any way. She further indicated that she found "complete lack of communication between the parents" and encouraged the trial court to "make a decision that minimizes the conflict between these two parties."
 {¶ 52} The trial court, as memorialized in a Judgment Entry filed on December 30, 2005, denied appellant's Motion to Modify Parental Rights and Responsibilities. The trial court also modified the parenting schedule set forth in the November 2002 Decree of Divorce. The trial court, in its entry, stated, in relevant part, as follows:
 {¶ 53} "The Court finds that O.R.C. Section 3109.04(E)(1)(a) requires the Court to determine whether there has been a change of circumstances with respect to the children or the residential parent and the Court may not modify parenting rights and responsibilities with respect to the naming of residential parenting unless it finds that the harm likely to be caused by changing environment is outweighed by the advantages in the change of environment of the child. Section 3109.04 requires the Court to consider *Page 9 
certain statutory factors which are based upon the best interests of the children when establishing or modifying parenting/visitation rights.
 {¶ 54} "The Court finds the Report of the Guardian Ad Litem states in its pertinent part `I do not see any change in circumstances that warrants a change of custody at this point . . . The court is encouraged to make a decision that minimizes the conflict between the two parties and the young children . . .'"
 {¶ 55} "The Court finds the Defendant/Mother was remarried to Jackson Flanigan, also a medical doctor, in June of 2004. Jackson Flanigan and his minor son, Trevor, have moved into the household with the Defendant/Mother and her children. Trevor Flanigan, who is age 13, does pick on the littler boys, his stepbrothers, from time to time and gives them a bad time like siblings do."
 {¶ 56} "The Court finds that the Plaintiff/Father has alleged various changes in circumstances of the Defendant/Mother and the children of this marriage, and has requested a modification of the parenting schedule. The Court finds the Plaintiff/Father has failed to prove such changes have occurred or that the changes that have occurred necessitate a modification of parental rights and responsibilities.
 {¶ 57} "The Court finds that both parties have shown credible evidence that circumstances surrounding the parties' and childrens's' [sic] current parenting schedule demonstrate a need to modify that schedule. The Court finds the parenting schedule as currently in effect is inappropriate and no longer in the best interests of the minor children."
 {¶ 58} Thereafter, appellant, on January 12, 2006, filed a Motion for New Trial pursuant to Civ. R. 59. The next day, appellee filed a Motion for Relief from Judgment *Page 10 
pursuant to Civ. R. 60(A), asking the trial court to clarify its December 30, 2005, ruling with respect to appellant's parenting time. Pursuant to an Entry filed on March 14, 2006, the trial court denied appellant's Motion for a New Trial. In a separate Entry filed the same day, the trial court clarified its December 30, 2005, Journal Entry with respect to parenting time.
 {¶ 59} Appellant now raises the following assignments of error on appeal:
 {¶ 60} "I. THE COURT ERRED AS A MATTER OF LAW WHEN IT INCORRECTLY APPLIED OHIO REV. CODE SECTION 3109.04 TO DENY APPELLANT'S REQUEST TO MODIFY THE PARENTING TIME SCHEDULE AND AS A BASIS FOR ITS DECISION TO ADMIT, IN PART, APPELLEE'S REQUEST TO MODIFY THE PARENTING TIME IN HER FAVOR.
 {¶ 61} "II. THE TRIAL COURT ABUSED ITS DISCRETION AND ERRED AS A MATTER OF LAW WHEN IT FOUND, AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, THAT THE SIGNIFICANT CHANGE IN THE MINOR CHILDREN'S HOME ENVIRONMENT DUE TO APPELLEE'S REMARRIAGE AND THEIR POOR RELATIONSHIP WITH THEIR STEPFATHER AND STEPBROTHERS, THE OLDER AGE OF THE MINOR CHILDREN AND APPELLEE'S REFUSAL TO SHARE INFORMATION RELATED TO THE CHILDREN'S HEALTH, EDUCATION AND ACTIVITIES WERE NOT CHANGES OF CIRCUMSTANCES PURSUANT TO OHIO REV. CODE SECTION 3109.04.
 {¶ 62} "III. THE COURT ABUSED ITS DISCRETION AND ERRED AS A MATTER OF LAW WHEN IT FOUND THAT CHANGES OF CIRCUMSTANCES OCCURRED, BUT FAILED TO CONSIDER THE BEST INTEREST OF THE MINOR *Page 11 
CHILDREN BEFORE IT DETERMINED THAT THOSE CHANGES DID NOT NECESSITATE A MODIFICATION OF PARENTAL RIGHTS AND RESPONSIBILITIES."
 I {¶ 63} Appellant, in his first assignment of error, argues that the trial court erred in applying R.C. 3109.04 to deny appellant's request to modify the parenting time schedule and as a basis for its decision to grant, in part, appellee's request for a modification of the parenting time schedule in her favor. We agree.
 {¶ 64} Modification of visitation rights is governed by R.C. 3109.051.Braatz v. Braatz, 85 Ohio St.3d 40, 706 N.E.2d 1218, 1999-Ohio-203, at paragraph one of the syllabus. R.C. 3109.051(D) sets forth fifteen factors the trial court is to consider in determining whether or not to modify parenting time. Such section states as follows: "(D) In determining whether to grant parenting time to a parent pursuant to this section or section 3109.12 of the Revised Code or companionship or visitation rights to a grandparent, relative, or other person pursuant to this section or section 3109.11 or 3109.12 of the Revised Code, in establishing a specific parenting time or visitation schedule, and in determining other parenting time matters under this section or section 3109.12 of the Revised Code or visitation matters under this section or section 3109.11 or 3109.12 of the Revised Code, the court shall consider all of the following factors:
 {¶ 65} "(1) The prior interaction and interrelationships of the child with the child's parents, siblings, and other persons related by consanguinity or affinity, and with the person who requested companionship or visitation if that person is not a parent, sibling, or relative of the child; *Page 12 
 {¶ 66} "(2) The geographical location of the residence of each parent and the distance between those residences, and if the person is not a parent, the geographical location of that person's residence and the distance between that person's residence and the child's residence;
 {¶ 67} "(3) The child's and parents' available time, including, but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedule;
 {¶ 68} "(4) The age of the child;
 {¶ 69} "(5) The child's adjustment to home, school, and community;
 {¶ 70} "(6) If the court has interviewed the child in chambers, pursuant to division (C) of this section, regarding the wishes and concerns of the child as to parenting time by the parent who is not the residential parent or companionship or visitation by the grandparent, relative, or other person who requested companionship or visitation, as to a specific parenting time or visitation schedule, or as to other parenting time or visitation matters, the wishes and concerns of the child, as expressed to the court;
 {¶ 71} "(7) The health and safety of the child;
 {¶ 72} "(8) The amount of time that will be available for the child to spend with siblings;
 {¶ 73} "(9) The mental and physical health of all parties;
 {¶ 74} "(10) Each parent's willingness to reschedule missed parenting time and to facilitate the other parent's parenting time rights, and with respect to a person who requested companionship or visitation, the willingness of that person to reschedule missed visitation; *Page 13 
 {¶ 75} "(11) In relation to parenting time, whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of the adjudication; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;
 {¶ 76} "(12) In relation to requested companionship or visitation by a person other than a parent, whether the person previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether the person, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of the adjudication; whether either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent previously has been convicted of an offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that the person has acted in a manner resulting in a child being an abused child or a neglected child; *Page 14 
 {¶ 77} "(13) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;
 {¶ 78} "(14) Whether either parent has established a residence or is planning to establish a residence outside this state;
 {¶ 79} "(15) In relation to requested companionship or visitation by a person other than a parent, the wishes and concerns of the child's parents, as expressed by them to the court;
 {¶ 80} "(16) Any other factor in the best interest of the child."
 {¶ 81} The trial court, in its December 30, 2005, Judgment Entry, stated, in relevant part, as follows:
 {¶ 82} "The Court finds that O.R.C. Section 3109.04(E)(1)(a) requires the Court to determine whether there has been a change of circumstances with respect to the children or the residential parent and the Court may not modify parenting rights and responsibilities with respect to the naming of residential parenting unless it finds that the harm likely to be cause by changing environment is outweighed by the advantages in the change of environment of the children. Section 3109.04 requires the Court to consider certain statutory factors which are based upon the best interests of the children when establishing or modifying parenting/visitation rights."
 {¶ 83} While R.C. 3109.04, which applies to modifications of parental rights and responsibilities, sets forth factors for a court to consider in determining whether modification of parental rights and responsibility is in a child's best interest, those factors are not the same as the visitation modification factors contained R.C. 3109.051. *Page 15 
"By applying R.C. 3109.04, the trial court considered factors which it was not required to consider, and ignored other factors which should have been a part of its review." Flynn v. Flynn, Franklin App. No. 02AP-801, 2003-Ohio-990 at paragraph 11. As noted by the court inFlynn "R.C. 3109.04 and 3109.051 are not identical or interchangeable and each may only be applied under the appropriate circumstances." Id. at paragraph 9.
 {¶ 84} Appellant's first assignment of error is, therefore, sustained.
 II, III {¶ 85} Appellant, in his second and third assignments of error, argues that the trial court erred in failing to find that a significant change had occurred in the circumstances of the three children and when it failed to consider the best interest of the children.
 {¶ 86} An appellate court will not reverse a trial court's decision regarding the custody of a child when it is supported by competent and credible evidence, absent an abuse of discretion. Bechtel v.Bechtel (1990), 49 Ohio St.3d 21, 550 N.E.2d 178, syllabus. The discretion in which the trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's decision will have on the lives of the parties concerned. Miller v. Miller (1988), 37 Ohio St.3d 71, 74,523 N.E.2d 846.
 {¶ 87} The power of a trial court to modify an existing custody decree is provided in R.C. 3109.04(E)(1)(a), which states: "The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the *Page 16 
child, his residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and * * * (iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child."
 {¶ 88} A trial court essentially applies a three-part test in determining whether a modification of child custody is appropriate. The test is: 1) whether there has been a change in circumstances; 2) whether a modification is in the best interest of the child; and 3) whether the harm resulting from the change will be outweighed by the benefits.In re: Kennedy (1994), 94 Ohio App.3d 414, 640 N.E.2d 1176. Where the record supports an affirmative answer to each question, the modification is appropriate under RC 3109.04(E) and is not contrary to law. Id.
 {¶ 89} As noted by the Ohio Supreme court in Davis v. Flickinger,77 Ohio St.3d 415, 674 N.E.2d 1159, 1997-Ohio-260, "[c]learly, there must be a change of circumstances to warrant a change of custody, and the change must be a change of substance, not a slight or inconsequential change." Id at 418. "The clear intent of the statute is to spare children from a constant tug of war between their parents who would file a motion for change of custody each time the parent out of custody thought he or she could provide the children a "better" environment. The statute is an attempt to provide some stability to the custodial status of the children, even though the parent out *Page 17 
of custody may be able to prove that he or she can provide a better environment." Id., quoting Wyss v. Wyss (1982), 3 Ohio App.3d 412, 416,445 N.E.2d 1153.
 {¶ 90} Appellant specifically contends, in part, that there was a change in the children's circumstances warranting modification of parental rights and responsibilities due to appellant's remarriage and the children's "poor relationship with their stepfather and stepbrothers." Appellant acknowledges that appellee's remarriage in and of itself may not constitute a change in circumstances, but argues that "the presence of a stepfather and two new stepsiblings in the home and everyday lives of the minor children, and the emotional harm they have caused the minor children undeniably constitute a change in circumstances."
 {¶ 91} However, there was a paucity of testimony as to such "poor relationship" at the hearing before the trial court. The only testimony was to the effect that the children's step-father swore in front of the children and that Trevor, the children's step-brother picked on them, although details were not given nor were any details provided as to Trevor's alleged behavioral problems. The trial court, in its December 30, 2005, Judgment Entry, found that Trevor Flanigan, the children's step-brother, who was thirteen (13) at the time, "does pick on the littler boys, his stepbrothers, from time to time and gives them a bad time like siblings do."
 {¶ 92} Appellant further argues that the older age of the children combined with appellee's refusal to share information with him about them constituted a change of circumstances. However, we find that such changes are not "changes of substance." With respect to the sharing of information, the Guardian Ad Litem, in her report, noted that appellee and her mother, the maternal grandmother, indicated that they gave *Page 18 
information to appellant and that he either refused to take it or crumpled it up. In addition, at the hearing, in this matter, appellee testified that appellant failed to provide her with information. She, for example, testified that Tyler's book bag was not returned to her at the conclusion of appellant's time with the children and that sometimes she got the book bag back without any homework or papers in the same. Appellee further testified that appellant was unresponsive when questioned about the book bag. Appellee's mother, Connie DeSelm, testified that her grandchildren were not permitted to take toys from appellee's house over to appellant's house. In short, there was testimony before the court that, due to the animosity between the parties, they both were less than forthright in sharing information.
 {¶ 93} With respect to the fact that the children are now older than they were at the time of the divorce, we note that this Court has held that passage of time alone is not sufficient to find a change of circumstances and relitigate the issue of custody. See Boone v.Kaser (Aug. 28, 2001), Tusc. App. No. 2001AP050050, 2001 WL 1011453. Rather, the passage of time during a significant developmental portion of a child's life must be combined with other pertinent factors. Id. As is discussed above, we find that such factors are not present in the case sub judice.
 {¶ 94} In short, upon our review of the record, we find that the trial court did not abuse its discretion by determining that appellant failed to establish that a change in circumstances had occurred that was significant enough to warrant a change of custody.
 {¶ 95} While appellant, in his third assignment of error, argues that the trial court improperly failed to consider the best interest of the minor children, we note that *Page 19 
"[w]hether there is a change of circumstances is a threshold inquiry, such that a change of circumstances must be present before a trial court will move on to the second prong of its analysis, that being the best interest of the children." See Andrews v. Andrews, Trumbull App. No. 2005-T-0121, 2006-Ohio-4942 at paragraph 41 (Footnotes omitted). Since the trial court did not find a significant enough change of circumstances so as to warrant a modification of parental rights and responsibilities, the trial court did not need to consider the best interest of the children in regard to the issue of modifying the custodial situation of the children.
 {¶ 96} Appellant's second and third assignments of error are, therefore, overruled.
 {¶ 97} Accordingly, the judgment of the Guernsey County Court of Common Pleas, Domestic Relations Division is affirmed in part and reversed and remanded in part for the trial court to apply the correct statute in its consideration of the modification of parenting time.
Edwards, J., Hoffman, P.J. and Delaney, J., concur
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Guernsey County Court of Common Pleas is affirmed in part and reversed and remanded in part. Costs assessed to appellant.
[1] Unless otherwise indicated, all references to the transcript are to the Transcript of the proceedings held on June 13, August 26, and September 11, 2005. *Page 1